**UNITED STATES of America, Plaintiff,**

**v.**

**James T. LABAT, Defendant.**

**Crim. No. 88–10059–01.**

United States District Court,
D. Kansas.

Oct. 12, 1988.

Jack Williams and Emily Metzger, Asst. U.S. Attys., Wichita, Kan., for plaintiff.

Marilyn Trubey, Asst. U.S. Public Defender, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Defendant James Labat was charged by indictment on June 15, 1988, with possessing with intent to distribute one kilo of cocaine in violation of 21 U.S.C. § 841(a)(1). The case is now before the court on defendant's motion to suppress. Defendant seeks to suppress certain items he contends were illegally seized from his luggage on June 2, 1988, and items seized from his vehicle at the time of his arrest on June 16, 1988.

The court heard oral argument on defendant's motion on September 26, 1988. After reviewing the testimony presented at the hearing and examining the briefs filed by the parties, the court is now prepared to rule.

The facts relevant to the court's determination of the motion are as follows:

In late 1987, a confidential informant advised Drug Enforcement Administration (DEA) task force agent Jim Woods that defendant James Labat was bringing large amounts of cocaine into Wichita from Los Angeles on a regular basis. In January, 1988, a second informant advised Woods that Labat was selling multi-ounces of cocaine to persons in Wichita and Park City. The informant stated that Labat made regular trips to Los Angeles and Phoenix and returned to Wichita with cocaine.

On June 1, 1988, the third informant advised Woods that Labat had departed Wichita for Los Angeles on May 31, 1988, and would return to Wichita on June 2, 1988. The informant believed Labat would be carrying a quantity of cocaine. The following morning, June 2, 1988, this informant again contacted Woods with the information that Labat would arrive at the Wichita airport on a 3:10 P.M. flight that day and would be met by his girlfriend. Agent Woods testified at the hearing on this motion that the agents believed they had probable cause to obtain a warrant after receiving information from the third informant regarding the time and place of defendant's arrival. However, they were advised by the United States Attorney's Office that they did not yet have sufficient information upon which to obtain a warrant, presumably because the third informant *believed* Labat would be carrying cocaine—but could not say for certain. Therefore, no attempt was made to obtain a warrant. In any event, DEA special agent Craig Stansberry decided to set up surveillance at Wichita Midcontinent Airport on June 2, 1988, and "if Labat arrives at the above time and date, surveillance will be utilized to develop enough probable

cause to approach and question him." Stansberry further determined that "based upon this questioning a determination will be made on whether to detain Labat and/or any luggage or to terminate the investigation." (Stansberry's Report of Investigation, June 6 & 7, 1988.)

Prior to going to the airport, the agents also attempted to obtain a trained narcotics detection dog in order to have the dog present at the airport when Labat arrived. They contacted both the Augusta, Kansas Police Department and a Newton, Kansas trainer, but were unable to obtain a dog from either source.

DEA agents were present when Labat's plane arrived at approximately 3:20 P.M. on June 2, 1988. The agents had a mug shot photo of Labat and thus they were able to identify him as he departed from the plane carrying a single, grey nylon shoulder bag. Labat met his girlfriend and left the airport terminal without claiming any luggage in the luggage claim area.

Outside the terminal the DEA agents approached Labat, identified themselves, and asked Labat if they could ask him a few questions. Labat was very cooperative and agreed to answer questions. Upon the agents' request, defendant produced a one-way, cash airline ticket which bore the name "Michael Vapp", and an Arizona driver's license which had been issued in the defendant's name. When questioned regarding this discrepancy, Labat explained that the name on the airline ticket was the name of a business associate in California, and the ticket had been issued in Vapp's name so the company could receive a tax deduction.

During the questioning, the agents noticed Labat was visibly trembling and shuffling his feet. The agents asked Labat for permission to search the bag he was carrying but Labat refused to consent. The agents then seized the bag and advised defendant that the United States Attorney's Office would be contacted about a search of the bag. Labat claims the agents then advised him they would keep his luggage and attempt to obtain a search warrant. In any event, agent Stansberry provided Labat with a business card and told Labat to call Stansberry at the number on the card in about one hour to find out whether the bag would be searched or returned. Labat, after being given a receipt for the bag, departed with his girlfriend.

Although the agents seized the bag at approximately 3:30 P.M., they did not immediately leave the airport. Instead, they made some phone calls, apparently in an attempt to determine what they should do with the bag. They left the airport about 4:00 P.M., and from there drove to the DEA Office in Wichita where they phoned the Augusta Police Department to arrange to have the bag sniffed by a trained narcotics detection dog. The agents left the DEA Office about 4:45 P.M. and drove to the Augusta Police Department.

On their way to Augusta, the agents were informed by radio that Labat had just called the DEA Office and talked with agent McDonald. Labat asked for agent Stansberry but was advised that Stansberry was not in. Labat also inquired about the bag but was given no information other than being told to call back later.

Agents Stansberry and Woods arrived in Augusta at approximately 5:00 P.M., and at 5:15 P.M. the bag was presented to a trained dog with negative results. At that point, instead of returning the bag to Labat, the agents again contacted the United States Attorney's Office and were advised there was really nothing else they could do [to obtain probable cause]. However, the agents had been advised that a second trained dog might be available so they arranged to have another sniff. At approximately 6:05 P.M., and prior to the second sniff, Labat again contacted the DEA Office in Wichita by phone. This time officer Jim Lane took the call. Labat again asked to talk to Stansberry but was advised that he wasn't there. Agent Lane then proceeded to ask Labat a number of questions, including whether there was anything perishable or hazardous in the bag. Labat responded negatively and asked when the bag would be returned to him. Agent Lane responded, "that's what they're checking on right now." Lane then asked

Labat where he was employed in California and what the name of his business was. Labat did not immediately respond to these questions but instead asked why the agents had detained the baggage, what was going on, and whether he was under arrest. Lane advised him that he was not under arrest but that the agents had reason to believe Labat had been carrying "some kinda controlled substance" in the bag. At that point in the conversation, Labat stated, "Well it wasn't even my bag to begin with but I'll go ahead and see what's going on ... I don't know nothing about what's going on. I don't even know whose bag it is.... So they can just keep the bag." Lane then asked Labat some additional questions about the company he allegedly worked for in California and the conversation ended.

Agent Lane immediately relayed information about the phone call to the agents in Augusta, and the agents once again contacted the United States Attorney's Office. They were advised by the United States Attorney's Office to consider the bag abandoned property and to search the bag.

However, before opening the bag, the agents subjected it to another sniff test by a trained narcotics detection dog; again with negative results. Despite this reaction, agent Woods searched the bag at 7:05 P.M. on June 2, 1988, approximately three and one-half hours after it was initially seized. The search revealed, among other items, a package wrapped in tape and cellophane containing approximately one kilo of cocaine.

Labat was charged by indictment on June 15, 1988, with possession with intent to distribute cocaine in violation of 21 U.S. C. § 841(a)(1). He was arrested while in his car on June 16, 1988, and a search of the automobile at the time of arrest uncovered a trace of marijuana, a trace of cocaine, a gun, ammunition, a package of cigarettes, one set of hemostats, and miscellaneous papers containing names and telephone numbers. A search of Labat's person produced $1,388.00 in U.S. currency.

Defendant now contends that the items seized from his bag on June 2, 1988 should be suppressed because the luggage was illegally seized in violation of his Fourth Amendment rights. Defendant further contends all items seized from his vehicle at the time of his arrest on June 16, 1988, and any statements made by him, should be suppressed as fruits of the illegal seizure.

Defendant initially contends the warrantless search of his luggage violated his Fourth Amendment right to be free from unreasonable searches and seizures, and the evidence discovered during that search should be suppressed. The government responds the warrantless seizure was not unlawful because the government had the "reasonable, articulable suspicion" necessary to detain defendant's luggage under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has interpreted this amendment to include the requirement that normally searches of private property be performed pursuant to search warrant. *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977). The basis for this requirement was well stated by Justice Powell in *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979), as follows:

> By requiring that conclusions concerning probable cause and the scope of a search "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime," we minimize the risk of unreasonable assertions of executive authority.

(Quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)).

There are a few "jealously and carefully drawn" exceptions to the warrant requirement which allow for situations where the societal costs of obtaining a warrant, such as danger to law enforcement officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to

a neutral magistrate. *Id.* 442 U.S. at 759, 99 S.Ct. at 2590 (quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958)). Moreover, the burden is on those seeking the exemption to show the need for it. *Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969).

### Investigatory Detention

Since no warrant was obtained by the government agents in this case, the burden is upon the government to prove its search of defendant's bag came within one of the exceptions to the warrant requirement. The government suggests that the search of the bag was lawful as part of a valid investigatory detention based upon a reasonable, articulable suspicion pursuant to *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879.

The investigatory detention, a brief seizure by police based upon a reasonable suspicion, was created as a "narrowly circumscribed" exception to the probable cause requirement of the Fourth Amendment. *Project: Criminal Procedure—Investigation and Police Practices*, 76 Georgetown L.J. 521, 561 (1988). The investigatory detention exception was originally applied in the case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868. In *Terry*, the court upheld "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). Under *Terry*, then, an investigatory detention may thus be initiated upon a "reasonable suspicion." 392 U.S. at 21, 88 S.Ct. at 1879. The *Terry* court justified the warrantless investigation on the basis that such a short investigation is less intrusive than a full-scale arrest, and such seizures serve important government interests which outweigh minimal intrusions into a suspect's privacy. 392 U.S. at 22, 88 S.Ct. at 1880.

The *Terry* investigatory detention exception has been applied to the seizure of personal property as well as to personal seizures. In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held the principles of *Terry* permitted the seizure of an airline traveler's luggage based upon a reasonable, articulable suspicion that the luggage contained contraband. The Court concluded: "When an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage *briefly* to investigate the circumstances that aroused his suspicion, provided that the investigative detention is *properly limited in scope.*" 462 U.S. at 706, 103 S.Ct. at 2644 (emphasis added).

While the Supreme Court in *Place* declined to adopt any outside time limitation for a permissible *Terry* stop, the Court found the 90-minute detention of the defendant's luggage in *Place* "sufficient to render the seizure unreasonable." 462 U.S. at 710, 103 S.Ct. at 2646. The Court further noted, "the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for the return of the luggage if the investigation dispelled the suspicion." *Id.*

Thus, the rule to be derived from *Place* and applied in the instant case is that an investigatory detention of luggage is permissible if (1) law enforcement officers have a reasonable suspicion that a traveler is carrying luggage containing narcotics; and (2) the investigative detention is properly limited in scope.

Accordingly, in the instant case the court must determine first whether the detention of defendant's bag was based upon a reasonable suspicion that the bag contained contraband. Second, the court must consider whether the detention of the bag was properly limited in scope.

A reasonable suspicion exists when specific and articulable facts, together with rational inferences drawn from such facts, reasonably suggest possible criminal activi-

ty. *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879. The primary basis for a reasonable suspicion is an official's own observations or the collective knowledge of all the law enforcement personnel involved in the investigation. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 680, 105 S.Ct. 1568, 1572, 84 L.Ed.2d 605 (1985). However, information from a reliable informant is another important basis for an investigatory detention. *See, e.g., McFadden v. United States*, 814 F.2d 144, 147 (3d Cir.1987).

█] In this case, the DEA clearly had a "reasonable suspicion" that defendant's bag might contain contraband. In addition to information from three different informants, the agents' own observations of defendant's conduct and his response to their questions supported the agents' reasonable suspicion that defendant's bag contained contraband.

Defendant does not even attempt to argue that the DEA did not have a reasonable suspicion to detain his bag. Rather, he focuses on the requirement that the detention be limited in scope and argues that the agents in this case went beyond their narrow authority to briefly detain luggage reasonably suspected to contain narcotics.

As already noted, the Supreme Court, in *Place*, found a 90–minute detention of an airline traveler's bag to be unreasonable where the bag was removed to another location and the agents failed to accurately inform the traveler where they were transporting his luggage, the length of time he might be dispossessed of it, and what arrangements would be made for its return.

█ While the Court in *Place* did not establish a "bright line test" as to the time period in which a bag can be detained, the facts of this case are analogous to those in *Place* and the same result applies here. In this case, defendant's bag was removed from the airport to a different location and the defendant was not informed where it was to be taken. Defendant was advised to call the DEA Office in an hour, but when he did call he was not given any information about his bag, but instead was advised he would have to call back later.

The bag was not subjected to an initial drug sniff until approximately two and one-half hours after it was seized from the defendant at the airport, and then only with *negative* results. Finally, instead of returning the bag to the defendant after the negative sniff, the agents waited a little longer and considered a second sniff by a different dog. These circumstances constitute an even more egregious delay than that contemplated by the Supreme Court in *Place*.

Finally, it is significant that here, as in *Place*, the agents had ample time to prepare for an investigation of the suspect. The officers knew at least a day in advance of the date of defendant's arrival, and several hours in advance of the approximate time of his arrival. The agents were waiting for Labat when he arrived at the airport and were aware that in all probability he would be carrying cocaine. Had this been "a swiftly developing situation," a longer delay in investigating the bag might be considered reasonable. *See, e.g., United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987) (50–minute delay of defendant's bag reasonable where officers did not know in advance of defendant's arrival). Here, however, the agents had ample opportunity to either attempt to obtain a warrant or have a trained drug detection dog present either at the airport or nearby. Their inability to accomplish either of these objectives was not the fault of defendant nor was it an excuse for the lengthy detention of the bag.

Under these circumstances, the court finds the detention of the defendant's bag went beyond the limited scope of the investigatory detention approved in *Terry*.

### Abandonment

The government next argues that even if the detention of defendant's bag went beyond the limited scope of an "investigatory detention," the subsequent search of the bag was valid because defendant "abandoned" the bag some two and one-half hours after it was seized by the agents. The government reasons that because de-

fendant disavowed ownership of the bag, he had no legitimate expectation of privacy in the bag at the time it was searched. Accordingly, the government contends defendant has no standing to challenge the legality of the search here.

Defendant responds that his alleged abandonment of the bag was merely an involuntary result of the agents' illegal conduct in detaining his bag, and as such did not constitute an abandonment of the bag.

The Tenth Circuit reviewed the "abandoned property" exception to the Fourth Amendment warrant requirement in *United States v. Jones*, 707 F.2d 1169 (10th Cir.), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983), and concluded that when individuals *voluntarily* abandon property they forfeit any expectation of privacy in it they might have had. 707 F.2d at 1172. If an individual has no expectation of privacy in property, then he has no standing to challenge a warrantless search or seizure of the property. *See Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

In *Jones*, the Tenth Circuit set out the test used to determine whether abandonment has occurred:

> The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. *[United States v.] Diggs*, 649 F.2d [731] at 735 [ (9th Cir.), *cert. denied*, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981) ]. This determination is to be made by objective standards. *United States v. Kendall*, 655 F.2d 199, 201 (9th Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982). An expectation of privacy is a question of intent, which "may be inferred from words spoken, acts done, and other objective facts." *Kendall*, 655 F.2d at 202 (quoting *[United States v.] Williams*, 569 F.2d [823] at 826 [5th Cir.1978]). "A finding of abandonment is reviewed under the clearly erroneous standard." *Diggs*, 649 F.2d at 735.

707 F.2d 1172. *See also United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir.

1987) (whether abandonment has occurred is a question of intent, which can be inferred from words, acts or other objective facts); *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir.1986) (inquiry into abandonment should focus on whether through words, acts or other objective indications a person has relinquished a reasonable expectation of privacy in the property at the time of the seizure). Further, the question of whether there is an abandonment justifying a warrantless search depends largely on the possessor's intent and the party relying upon it must establish the necessary state of mind by clear and unequivocal evidence. *United States v. Abbott*, 584 F.Supp. 442, 451 (W.D.Pa.1984).

█ In this case, the government focuses solely on Labat's statements to agent Lane, in which he disavowed ownership of the bag, and argues those statements constitute a clear abandonment of defendant's interest in the bag. Accordingly, the government argues the defendant cannot contest the search and seizure of the bag.

Defendant argues, however, that his statements disavowing his interest in the bag were precipitated by the illegal nature of the DEA agents' actions. Specifically, defendant notes that he did not disclaim ownership of the bag when he was initially approached at the airport. Rather, he refused to consent to the warrantless search of his bag. Nor did defendant disclaim ownership of the bag when he contacted the DEA Office approximately 75 minutes after the bag had been seized. Instead, he contacted the DEA Office again, some two and one-half hours after the bag's seizure, only to be advised that the officers were *still* checking on the bag. It was only at that point that defendant disclaimed ownership of the bag. Thus, defendant suggests the objective facts support a finding that his disclaimer was not voluntary, but rather was a product of the agents' unlawful detention of his bag. This court agrees.

A loss of standing to challenge a search cannot be brought about by illegal police conduct. *Floyd v. United States*, 677 F.Supp. 1083, 1091 (D.Colo.1987). The existence of police pursuit or investigation,

however, does not *per se* render abandonment involuntary. *United States v. Jones*, 707 F.2d at 1172. Rather, this court finds, as have other courts, that if the challenged evidence is to be suppressed, defendant must show a nexus between the allegedly unlawful police conduct and the abandonment of the property. *See, e.g., United States v. Gilman*, 684 F.2d 616, 620 (9th Cir.1982) (there must be a "nexus" between allegedly unlawful police conduct and abandonment of property in order to render abandonment involuntary); *United States v. Beck*, 602 F.2d 726, 730 (5th Cir.1979) (where there is a "nexus" between unlawful police conduct and the discovery of the challenged evidence, the evidence should be suppressed). *But see United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983) (where defendant's disclaimer of luggage not precipitated by improper conduct on part of agents, subsequent search of suitcase did not violate Fourth Amendment). *See generally* Annot., 40 A.L.R. 4TH 381 (1985).

In the instant case, unlike the cases cited by the government, defendant did not disclaim ownership of the bag before its seizure by the officers. In fact, defendant's actions were initially consistent with ownership of the bag. Moreover, it is significant that defendant did not disclaim ownership of the bag the first time he called to check upon the status of the bag approximately one hour after its seizure. Instead, he called a second time to check on the status of the bag, at which point he was not only told that the officers were still checking on the bag, but was asked additional questions about the contents of the bag and about the nature of his employment in California. It was not until this point, some two and one-half hours after the bag was taken from defendant, that defendant "abandoned" the bag.

Under these circumstances, the court finds that defendant's belated disavowal of ownership of the bag was an involuntary act precipitated only by the agents' unlawful conduct in detaining the bag. Accordingly, the court finds the evidence discovered in the search of the bag must be suppressed.

In addition, the court finds that the items seized during the search of defendant's vehicle subsequent to his arrest must also be suppressed as fruits of the illegal search of defendant's luggage.