

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD84964 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | March 7, 2023 |
| LEE ALLEN HANELINE, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Buchanan County, Missouri**
The Honorable Patrick K. Robb, Judge

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Alok Ahuja, Judge and Jerri J. Zhang, Special Judge

Lee Allen Haneline ("Haneline") appeals the judgment of the Circuit Court of Buchanan County, Missouri ("trial court"), following a jury trial, convicting him of one count of possession of a controlled substance (Felony D), section 579.015.[1]  Haneline raises three points on appeal and argues that:  (1) the trial court erred in overruling Haneline's motions for judgment of acquittal because the State failed to prove beyond a reasonable doubt that Haneline had knowledge of and control over the controlled substance which he

---

[1] All statutory references are to Revised Statutes of Missouri (2016), as updated by supplement as of May 28, 2020, unless otherwise indicated.

1

was charged with possessing; (2) the trial court erred in admitting testimony that the lunchbox contained drug paraphernalia because the State did not prove that the items in the lunchbox were, in fact, drug paraphernalia, thus the testimony was not relevant; and (3) the trial court erred in admitting the contents of the lunchbox into evidence because the contents were the product of an unreasonable, warrantless search.[2] We reverse and remand for a new trial.

## Statement of Facts[3]

On May 28, 2020, Deputy Marcus Garza ("Garza") of the Buchanan County Sheriff's Office was patrolling the Jentell Brees Conservation area around midnight in his patrol car. As Garza drove through the park, he observed Haneline on all fours digging in the ground on an embankment near a creek. When Haneline noticed the high-beam lights from Garza's patrol car, he got up and wiped himself off. Garza exited his patrol car and approached Haneline to investigate and began speaking with Haneline just a few steps from where Haneline had been digging. Garza did not observe anyone else in the conservation area.

Garza asked Haneline why he was digging, and Haneline could not give a straight answer. Haneline stated that he was night fishing with his friend, Randy, who was across the creek in his kayak. Haneline yelled out for Randy to come back. Garza radioed for

---

[2] Haneline initially asserted a fourth point on appeal that the trial court erred in entering written judgment and sentence of three years' imprisonment in the Missouri Department of Corrections because the trial court's oral pronouncement of sentence was nine months in the county jail. At oral argument, Haneline's attorney affirmatively waived this allegation of error.

[3] We consider the testimony in a light most favorable to the verdict, and contrary evidence and inferences are disregarded. *State v. Rutter*, 93 S.W.3d 714, 720 (Mo. banc 2002).

backup units to assist him, and additional deputies arrived at the location approximately fifteen minutes later. While waiting for backup units to arrive, Garza and Haneline continued to talk. Garza did not observe anything that suggested Haneline was under the influence of or had ingested drugs or alcohol. At approximately the time the other officers arrived, Randy came back to the area in a kayak. He was not questioned or searched and was allowed to leave. When the additional officers arrived, Haneline went to talk to the other deputies, and Garza began looking at the ground where Haneline had been digging. There, Garza observed a pellet air rifle sitting on the ground and next to it, also sitting on the ground, was a black lunchbox with a zippered top that was partially opened. Garza unzipped the lunchbox and inside Garza found a radio antenna, several disposable razor blades, batteries, a lottery ticket, a lighter, a pocketknife, a prescription medicine bottle in a name other than Haneline's, a set of car keys, and Haneline's Missouri driver license. Garza subsequently noticed the stem of a plastic baggy sticking out of the disturbed dirt where Haneline had been digging, approximately three feet from the black lunchbox. Garza picked up the plastic baggy and found that it contained a white, crystalline substance, which was later tested and determined to contain less than one gram of methamphetamine.

After observing the items in the lunchbox and the plastic baggy containing what he believed to be methamphetamine, Garza placed Haneline under arrest. As Garza was handcuffing Haneline, Haneline stated that the black lunchbox and the plastic baggy were not his. Garza informed Haneline that he found Haneline's driver license inside the black lunchbox, but Haneline continued to deny that the items belonged to him. Haneline's person and his vehicle were searched, and no illegal or controlled substances were found.

3

Garza was charged with one count of possession of a controlled substance for possessing methamphetamine.

Before trial, Haneline moved to suppress the contents of the lunchbox as the result of an unreasonable, warrantless search. The trial court held a suppression hearing, at which Garza testified. Garza testified that when he observed the black lunchbox, it was partially unzipped, and he unzipped the lunchbox completely to see the contents. Garza was unable to see the contents until he fully unzipped the lunchbox. Garza conceded that he did not obtain Haneline's consent to search the lunchbox, and he had no probable cause to believe a crime had been committed or that something illegal was inside the lunchbox. Further, he was not concerned for his safety because he had already asked Haneline if he had any weapons, and Haneline was 20 to 30 feet away talking to other deputies.[4]

Garza testified that, in his experience, methamphetamine users use radio antennas, razor blades, and batteries as drug paraphernalia. Garza testified that metal radio antennas are used to poke and prod at methamphetamine crystals while the user is smoking it to make the crystals burn easier. Garza also testified that razor blades are used to grind the crystals to make them finer so they can be more easily smoked, and batteries are similarly used to cut the substance and amplify the high users experience while smoking.

Haneline testified at the suppression hearing that the lunchbox belonged to him and that he never denied ownership of the lunchbox. The trial court denied Haneline's motion to suppress and stated on the record that the search was reasonable because Haneline did

---

[4] At trial Garza testified the distance was 20 to 40 yards as opposed to 20-30 feet. This distinction is not relevant to the resolution of the issues before us.

not have any expectation of privacy in the lunchbox in that it had been abandoned because it was not in his possession, and he left it on the ground in a public park. The contents of the lunchbox were admitted over objection at trial. Prior to the introduction of evidence at trial, the trial court found Haneline to be a prior and persistent offender based on his previous criminal convictions.

Haneline moved for judgment of acquittal after the State rested, which the trial court denied. The jury returned a guilty verdict on the sole count of possession of a controlled substance. At the sentencing hearing, the trial court indicated that it did not believe probation was appropriate based on Haneline's criminal history but also did not believe "the sentence to the penitentiary is justified" and stated, "The Court is going to sentence the defendant to serve nine months in the county jail." The written judgment of conviction, however, states that Haneline was convicted of possession of a controlled substance, a class D felony under section 579.015, and states that "Defendant is sentenced to 3 years in the Missouri Department of Corrections[.]" This appeal follows.

**Analysis**

*Application of the escape rule*

As an initial matter, the State argues that Haneline's appeal should be dismissed, pursuant to the "escape rule," because he failed to present himself to the court clerk the day following the trial to begin the process of preparing a sentencing assessment report as ordered by the trial court. A warrant was issued for Haneline's arrest based on his failure to contact the court clerk. Haneline did appear in court on the date and time set for sentencing, and the warrant was served on him at that time. Because he failed to comply

5

with the order of the court, a sentencing assessment report was not prepared for the trial court's consideration at sentencing.

The "escape rule" is a procedural rule designed to protect the orderly and efficient use of Missouri's judicial resources. *State v. Troupe*, 891 S.W.2d 808, 809 (Mo. banc 1995). "The escape rule operates to deny the right of appeal to a defendant who escapes justice." *Id.* "A defendant who flees justice also loses the opportunity to seek postconviction relief." *Id.* The appellate court's sound discretion decides whether to invoke the escape rule after weighing whether the escape adversely affects the criminal justice system. *Id.* at 811.

> Here, after the jury returned a guilty verdict, the trial court stated on the record:
>
> The Court is going to order that a sentencing assessment report be conducted on the defendant. The defendant will be directed to make contact with the court clerk. And it's after 5:00, so the court clerk is not available.
>
> So you need to contact the court clerk tomorrow, Mr. Haneline, and -- tomorrow after 9:00 a.m. and she'll give you directions about making contact with Probation & Parole. You're directed to make contact with Probation & Parole, maintain communication with them so they can do the sentencing assessment report on you, and then return to this courtroom for the motion and possible sentencing hearing.

Haneline did not contact the court clerk the morning after the trial or contact the department of probation and parole to assist in the preparation of the sentencing assessment report. The Court issued a warrant for Haneline's arrest due to his failure to contact the court clerk as ordered and for failing to comply with the conditions of his bond. Haneline did appear in court for the original sentencing hearing, and the warrant was served on him. A sentencing assessment report was not prepared due to Haneline's actions in failing to

6

follow the court's order. The sentencing hearing was continued for one week, and the trial court relied on Haneline's prior criminal record and the arguments of counsel at the sentencing hearing. Although Haneline's failure to appear delayed the administration of justice and resulted in a sentencing assessment report not being completed, it was a minor delay that the trial court considered in sentencing Haneline, and Haneline later voluntarily appeared at the sentencing hearing. Therefore, we exercise our discretion and decline to invoke the escape rule, and we proceed to adjudicate the merits of Haneline's appeal.

We address the points relied on out of order for ease of analysis.

### Point III: Admission at trial of the contents of the lunchbox

Haneline argues the trial court erred in denying the motion to suppress and overruling his objections and allowing the admission of the contents of the lunchbox as evidence at trial. Haneline does not challenge the admission of the plastic baggie or the methamphetamine contained therein into evidence at trial. "When reviewing the trial court's denial of a motion to suppress, we must determine whether sufficient evidence exists to sustain the trial court's findings." *State v. Courtney*, 102 S.W.3d 81, 84 (Mo. App. W.D. 2003). In doing so, we consider both the record from the suppression hearing and the record made at trial. *Id.* We view the facts and inferences in the light most favorable to the trial court's finding, and we will reverse only if we are left with a definite and firm belief that a mistake has been made. *State v. Taber*, 73 S.W.3d 699, 703 (Mo. App. W.D. 2002). "Whether the State has violated the Fourth Amendment is a separate question of law, however, and one which we review *de novo*." *Courtney*, 102 S.W.3d at 85.

7

Both the United States Constitution and the Missouri Constitution guarantee a protection against unreasonable searches and seizures. U.S. Const. amend IV; Mo. Const. art. I, section 15. These corresponding guarantees are coextensive. *State v. Rushing*, 935 S.W.2d 30, 34 (Mo. banc 1996). A warrantless search is presumptively invalid under the Fourth Amendment, and the State has the burden to prove justification for such a search upon a defendant's motion to suppress. *State v. Looney*, 911 S.W.2d 642, 644 (Mo. App. S.D. 1995); section 542.296.

"To enjoy Fourth Amendment protection, an individual must have a subjective expectation of privacy[,] and that expectation must be objectively reasonable." *Courtney*, 102 S.W.3d at 85. "An individual may have a legitimate expectation of privacy in personal items regardless of location." *Id.* A defendant's expectation of privacy in personal objects is objectively reasonable when he conceals those contents in a container that is hidden from plain view. *Id.*; *see also Looney*, 911 S.W.2d at 644 ("Individuals can manifest legitimate expectations of privacy by placing items in closed, opaque containers that conceal their contents from plain view.").

Here, Haneline had a subjective expectation of privacy in the contents of the black lunchbox. By concealing the items from plain view inside the lunchbox, "he demonstrated an intent to keep the contents hidden." *Courtney*, 102 S.W.3d at 85. Garza testified that, although the lunchbox was partially unzipped, he had to completely unzip the lunchbox in order to see its contents. Haneline's expectation of privacy was also objectively reasonable, in that "[t]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *Id.* (quoting *United States v. Ross*, 456 U.S. 798,

8

822-23 (1982)).  Further, although the lunchbox was on the ground, it is clear that Garza understood that the lunchbox belonged to Haneline.  When Haneline and Garza first began talking, they were only steps away from the items on the ground.  Garza did not ask Haneline if the lunchbox belonged to him or if he would consent to a search of it.  Given that Garza's suspicions surrounding Haneline began when he saw Haneline digging in the dirt, it was reasonable for Garza to expect certain items belonging to Haneline to be located in that area.  And an "individual may have a legitimate expectation of privacy in personal items regardless of location."  *Courtney*, 102 S.W.3d at 85.  Because the lunchbox concealed its interior contents from plain view, the Fourth Amendment requires consent of the owner, a warrant, or some other recognized exception to the warrant requirement to search those contents.

The State argues, and the trial court found, that even if Haneline initially had a reasonable expectation of privacy in the lunchbox, he forfeited that right by abandoning the lunchbox when he walked away from it, leaving the items accessible to anyone in the public conservation area.  "It is well held that the warrantless search or seizure of abandoned property does not violate the fourth amendment."  *State v. Qualls*, 810 S.W.2d 649, 652 (Mo. App. E.D. 1991).  Whether or not a defendant abandoned his property is primarily an objective question of intent, which may be inferred from "words spoken, acts done and other objective facts."  *Id.*  (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973)).  The State argues two exceptions to the warrant requirement apply in this case.  First, the State argues Haneline abandoned the lunchbox by walking away from it

9

when he went to talk to the officers. Second, the State argues that Haneline abandoned the lunchbox by denying it belonged to him after he was arrested and was being handcuffed.

Here, Haneline did not abandon the lunchbox. Garza testified that he first observed Haneline from his patrol car digging in the ground. Because this was suspicious, Garza approached Haneline on foot and began talking to him "near the spot where he had been digging." Garza testified, "Well, after, you know, I had made contact with him, he kind of took a few steps from where he was digging and we had talked." Haneline and Garza spoke at that location for fifteen minutes while they waited for other deputies to arrive. When the backup officers arrived, Garza testified that Haneline walked over to them and had a conversation. At that time, Garza began looking at the ground to investigate why Haneline had been digging. There, he found the pellet rifle, the black lunchbox, and plastic baggy in that order. This evidence is insufficient to support an inference that, by momentarily walking away from that area, Haneline abandoned the items on the ground such that he relinquished the objectively reasonable expectation of privacy in the concealed items in the black lunchbox.

Although Haneline walked toward the additional deputies, he did not abandon his property. A survey of cases finding that a defendant *did* abandon property is instructive. In *State v. Qualls*, police were looking for individuals with felony warrants outside a known drug house in their patrol cars. 810 S.W.2d at 651. Qualls exited the house and observed police officers on the street and turned around to walk back inside the house. *Id.* Officers approached Qualls, who threw a bottle into the grassy area of the yard. *Id.* Qualls denied ownership of the bottle. Police retrieved the bottle and searched it to discover that it

10

contained heroin. *Id.* The Court, under plain error review, held that Qualls abandoned the bottle "by throwing [it] into the grassy area of the yard[, which] placed the bottle and its contents within the reach of the world generally, thereby relinquishing his reasonable expectation of privacy in that bottle." *Id.* at 652.

Similarly, in *United States v. Segars*, 31 F.3d 655 (8th Cir. 1994), police were located inside an apartment complex to await the delivery of drugs from a known drug courier. When the defendant knocked on the door of a particular apartment unit, the police approached the defendant. *Id.* at 657. The defendant dropped the package he was carrying and fled. *Id.* The police searched the package and discovered it contained cocaine. The court found that "[t]he evidence showed that, when confronted by police officers, Segars dropped the package, backed away from the apartment door and attempted to flee." *Id.* at 658. Because the defendant dropped the package and fled when confronted by police, he relinquished any privacy interest in the package, thus subjecting the package to a warrantless search. Other cases with similar facts have held that where an individual drops, throws, or otherwise discards contraband while being pursued by a police officer, "the contraband is deemed to have been abandoned, and Fourth Amendment protections no longer apply." *State v. Mosby*, 94 S.W.3d 410, 418 (Mo. App. W.D. 2003) (citing *California v. Hodari D.*, 499 U.S. 621 (1991)); *see also State v. Immekus*, 28 S.W.3d 421 (Mo. App. S.D. 2000) (holding that the defendant abandoned a tape recorder in a motel room that was used to audio record the assault of a woman).

This case is dissimilar from the aforementioned cases. Viewing the evidence in the light most favorable to the trial court's ruling, Haneline spoke with Garza for fifteen

11

minutes just steps away from the items on the ground. There was no one else in the area at the time. When the other officers arrived, Haneline walked over to them, and they had a conversation while Garza searched the ground where Haneline had been digging. Haneline did momentarily walk away from his conversation with Garza to speak with the other officers, but nothing suggests that he intended to relinquish his privacy interest in the closed lunchbox that concealed its contents. Unlike the cases mentioned above, Haneline did not flee, he was not pursued by police, and he did not discard the lunchbox in an attempt to destroy or conceal the container containing the incriminating evidence. Rather, after Haneline walked over to the other officers, the lunchbox was still in plain view, though its contents remained concealed. There is not sufficient evidence to support an inference that Haneline abandoned the lunchbox on the ground prior to Garza unzipping the lunchbox, which clearly belonged to Haneline. Nor is it the case that Haneline left the lunchbox in an open field where it was unclear who owned the lunchbox or walked away from it in an area crowded with people where it may be unreasonable to leave an item unattended. *Compare United States v. Stallings*, 28 F.3d 58, 61 (8th Cir. 1994) ("Stallings left the bag unattended in an open field in which he had no possessory interest with no apparent means of restricting access to it."). "For Fourth Amendment analysis, the test for determining abandonment is primarily a question of intent, which may be inferred from words spoken, acts done and other objective facts." *Looney*, 911 S.W.2d at 644 (internal quotations omitted). There is no evidence to establish that Haneline intended to abandon the lunchbox.

12

The State also argues that Garza's subsequent disclaimer of ownership in the lunchbox constitutes abandonment. A defendant's disclaimer of ownership in property is evidence of an intent to abandon it. *See Qualls*, 810 S.W.2d at 652. "Ordinarily, a defendant who voluntarily abandons property has no standing to contest its search and seizure, but this is not true if the abandonment results from a Fourth Amendment violation, as such an abandonment cannot be voluntary." *State v. Solt*, 48 S.W.3d 677, 682 (Mo. App. S.D. 2001). The Missouri Supreme Court has recognized the well-settled principle that abandonment will be found only when incriminating evidence has been abandoned voluntarily, and that abandonment is not voluntary if it results from an illegal seizure. *See State v. Grayson*, 336 S.W.3d 138, 151 n.7 (Mo. banc 2011) (citing *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000); *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir. 1995); *Segars*, 31 F.3d at 658).

Other state and federal courts have held that, although the existence of police pursuit or investigation does not *per se* render abandonment involuntary, where the defendant shows a nexus between the allegedly unlawful police conduct and the abandonment of property, the abandonment is rendered involuntary. *See United States v. Labat*, 696 F. Supp. 1419, 1424 (D. Kan. 1988); *United States v. Beck*, 602 F.2d 726, 730 (5th Cir. 1979); *United States v. Gilman*, 684 F.2d 616, 620 (9th Cir. 1982). In determining the causal nexus between the illegality of a search and the abandonment, courts examine the totality of the circumstances, including the temporal proximity between the constitutional violation and the abandonment, any intervening circumstances, and the flagrancy of the State's misconduct. *State v. Grant*, 614 N.W.2d 848, 855 (Iowa Ct. App. 2000).

13

Here, Haneline did not make any statements regarding the objects on the ground until after Garza arrested Haneline. Haneline then denied ownership in any of the contents found on the ground. Garza informed Haneline that he found Haneline's Missouri driver license inside the black lunchbox, and Haneline continued to deny ownership in the lunchbox. Haneline's denial of the lunchbox was instantaneous to him learning that Garza had searched the lunchbox and placed him under arrest without any intervening circumstances. It is clear from the record that Haneline's alleged abandonment of the lunchbox through his statements denying ownership of it was directly caused by Garza's illegal search of the lunchbox. Therefore, the abandonment was involuntary and cannot be relied on in denying Haneline standing to assert his Fourth Amendment claims.

Several cases involving post-seizure disclaimers of ownership in personal property illustrate that the Fourth Amendment renders evidence of abandonment involuntary if it results from illegal police conduct, such as an unreasonable, warrantless search. In *State v. Grant*, the Iowa Court of Appeals reversed the trial court's denial of a motion to suppress because it clearly erred in admitting evidence based on a theory of abandonment where the only evidence of abandonment was the defendant's denial of ownership in a jacket containing a controlled substance after it had been searched by police without a warrant. 614 N.W.2d at 855. In *Grant*, the defendant (Grant) and her partner (Brown) were guests in a home owned by Dollison. *Id.* at 851. Dollison had called the police because he believed that a woman who had previously stayed in the house left a gun inside the house. *Id.* When police arrived, Dollison gave police permission to search the room that was being occupied by Grant and Brown, who were both sleeping at the time. *Id.* The police woke

14

Grant and Brown to search for the gun, and the couple offered to help the police look for it. *Id.* In searching the room, the police picked up Grant's jacket, which was noticeably heavy and contained a large bulge in one pocket. *Id.* Fearing it was a weapon, the police unzipped the pocket and discovered crack cocaine. *Id.* The police told Grant and Brown to leave the room with their belongings, and Grant then denied that the jacket belonged to her. *Id.*

Upon Grant's motion to suppress the contents of the jacket, the State argued that because Grant denied ownership of the jacket after it was searched, she failed to maintain her expectation of privacy in it. *Id.* at 855. The Court of Appeals reversed the trial court's denial of Grant's motion to suppress because it

> appears Grant was aware the officers had found the crack cocaine before they asked Grant and [Brown] to gather their belongings. Understandably, Grant no longer wanted to be associated with the jacket and refused to acknowledge ownership. The temporal proximity between the illegal search and the subsequent abandonment was nearly instantaneous, and there were no other intervening circumstances.

*Id.* Therefore, the abandonment was involuntary and could not be relied upon in denying Grant's opportunity to assert her Fourth Amendment claims. *Id.*

In *Labat*, the federal district court granted Labat's motion to suppress the contents of his luggage where the only evidence of abandonment was Labat's statements disclaiming ownership in luggage after it had already been seized. 696 F. Supp. at 1425. DEA agents had received a tip that Labat may be carrying controlled substances in his luggage on his flight to Wichita. *Id.* at 1420. DEA agents set up surveillance at the Wichita airport but did not obtain a warrant for Labat's luggage and did not have drug dogs waiting at the

15

airport. *Id.* When Labat landed, agents approached him and questioned him regarding his trip. *Id.* at 1421. Agents asked Labat's permission to search his bag, and he refused. *Id.* The agents then seized the bag and told Labat that they were keeping his luggage in an attempt to obtain a search warrant. *Id.* Labat was told to contact Agent Stansberry of the DEA in one hour to see if he would be able to retrieve his luggage. *Id.* The agents then had to transport the luggage to a DEA office to have drug dogs perform a sniff in order to establish probable cause, which produced a negative result. *Id.* Labat called the number given to him several times over the next few hours and was told to call back later. *Id.* Finally, Labat was told that the agents had reason to believe Labat had been carrying a controlled substance in the bag. *Id.* at 1422. At that point, Labat stated, "Well it wasn't even my bag to begin with but I'll go ahead and see what's going on . . . I don't know nothing about what's going on. I don't even know whose bag it is . . . So they can just keep the bag." *Id.* Following this phone call, the agents considered the bag abandoned and searched it without a warrant or probable cause. *Id.* The search of the bag revealed one kilo of cocaine. *Id.*

In finding that Labat's statements denying ownership in the bag did not constitute abandonment subsequent to the bag being seized, the district court held that Labat "did not disclaim ownership of the bag before its seizure by the officers." *Id.* at 1426. Labat repeatedly called to inquire regarding the status of the bag, and he did not disclaim ownership until two and one-half hours after it had been taken from him at the airport. *Id.* Accordingly, the court concluded that Labat's "belated disavowal of ownership of the bag was an involuntary act precipitated only by the agents' unlawful conduct in detaining the

bag." *Id.* Other state courts have similarly found that disclaiming ownership after an illegal search or seizure could not be relied upon to argue abandonment. *See Erickson v. State*, 181 P.3d 1117 (Alaska Ct. App. 2008) (reversing the trial court's denial of a motion to suppress because Erickson's disclaimer of ownership in a black bag found next to his truck that contained controlled substances followed an illegal pat-down search); *Commonwealth v. Small*, 552 N.E.2d 599 (Mass. App. Ct. 1990) (affirming the trial court's grant of a motion to suppress, finding that the government's claim of abandonment upon the defendant dropping certain bags and disclaiming ownership was unpersuasive).

The State argues that other Missouri cases have found that a defendants' statements denying ownership during the search or after the search constitute evidence of abandonment. In *State v. Toolen*, for example, the Eastern District of this Court reversed the trial court's grant of a motion to suppress when the defendant denied ownership of a canvas bag that contained a controlled substance. 945 S.W.2d 629, 630 (Mo. App. E.D. 1997). In *Toolen*, the defendant signed a "Permission to Search" form to allow officers to search a rental car parked in the driveway of a mobile home, and police found the canvas bag in the trunk. *Id.* As the police searched the canvas bag that contained plastic bags of drugs, they asked the defendant if the canvas bag belonged to him, and the defendant replied that it did not. *Id.* The Court held that the defendant's disclaimer of ownership in the bag prevented him from asserting an expectation of privacy therein. *Id.* at 632. In *State v. Breese*, the Southern District of this Court affirmed the trial court's denial of a motion to suppress where the police searched the defendant's shower bag that was in the front seat of a vehicle he did not own. 250 S.W.3d 413, 419 (Mo. App. S.D. 2008). After the police

17

searched the bag, which contained a controlled substance, the defendant stated that the bag did not belong to him. *Id.* The Court in *Breese* emphasized that the search was permissible under the automobile exception to the warrant requirement because, under the totality of the circumstances, a reasonably prudent individual would believe that contraband was located inside the automobile. *Id.*

Neither *Toolen* nor *Breese* supports the State's position that Haneline's post search disclaimer of ownership constitutes abandonment of the lunchbox. Here, Haneline only denied ownership of the lunchbox after it had been searched by Garza, which was an unreasonable, warrantless search of a closed container, and as Haneline was being arrested. The denial directly resulted from illegal police conduct. In *Breese*, by contrast, the Court emphasized that the automobile exception to the warrant requirement validated the search of the contents of the automobile. 250 S.W.3d at 419. The defendant's denial of ownership was additional evidence of abandonment following an otherwise valid search. *Id.* And in *Toolen*, the defendant had consented to a search of the vehicle, and it is unclear from the court's analysis whether the canvas bag in the trunk was considered a closed container. 945 S.W.2d at 630. Neither case discusses the circumstance in which the State's only evidence of abandonment is a disclaimer of ownership in property immediately following a flagrant act of a police officer's illegal search. Further, even if the searches in *Toolen* and *Breese* were unreasonable and did directly lead to the defendants' denial of ownership, both cases were decided *before* the Missouri Supreme Court's decision in *Grayson*, which clearly recognizes that "abandonment will be found only when incriminating evidence has been abandoned voluntarily, and that abandonment is not voluntary if it results from an illegal

18

seizure." *Grayson*, 336 S.W.3d at 151 n.7. Therefore, we decline the State's request to declare this a valid search pursuant to *Toolen* and *Breese*.

The State conceded at oral argument that the only ground that would justify the warrantless search of the lunchbox was abandonment either by Haneline walking away from it or abandonment by denying ownership of the lunchbox after it was searched and Haneline was arrested. We note, however, that other exceptions to the warrant requirement that may have justified Garza's search of the closed lunchbox are inapplicable here. For example, "[c]onsent searches are a valid exception to the warrant requirement[.]" *State v. Hindman*, 446 S.W.3d 683, 687 (Mo. App. W.D. 2014). However, Garza testified that he never obtained Garza's permission to search the lunchbox. Police may also stop a person briefly without probable cause when the police identify specific and articulable facts leading to a reasonable suspicion that criminal activity is afoot. *Courtney*, 102 S.W.3d at 87 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The scope of a *Terry* stop is limited to ensuring that police may confirm or dispel their suspicions without fear of violence. *Id.* Where an officer concedes that he did not fear that a closed canister contained a weapon or that it threatened anyone's safety, he is not justified in searching the canister without a warrant. *See State v. Leavitt*, 993 S.W.2d 557, 562 (Mo. App. W.D. 1999); *State v. Hutchinson*, 796 S.W.2d 100, 107 (Mo. App. S.D. 1990). Here, Garza affirmatively testified that he did not fear for his safety or believe that Haneline might be armed. At the time Garza opened the lunchbox, Haneline was talking to the other deputies some distance away from Garza and did not pose a safety risk to Garza or the other officers. Garza had inspected the rifle and determined that it was a pellet rifle and not a firearm. Further, Garza

19

did not observe any indication that Haneline had ingested or was impaired by drugs or alcohol, and Garza did not locate the baggie containing methamphetamine until after he had searched the lunchbox. Therefore, Garza's search of the lunchbox was not justified based on a police officer's authority to conduct a brief, investigatory stop under *Terry*. Because no exception applies to the warrantless search of Haneline's lunchbox, we find that it was searched in violation of Haneline's Fourth Amendment protection against unreasonable searches and seizures.

We must next determine whether the trial court's error requires reversal. "Constitutional errors . . . do not require reversal if the error was harmless beyond a reasonable doubt." *State v. Sachs*, 372 S.W.3d 56, 64 (Mo. App. W.D. 2012). "Harmless beyond a reasonable doubt means that no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict." *Id.* "The harmless error standard recognizes the relative harm improper evidence may inject depending on its strength, its relevance, and the presence of other evidence of guilt." *State v. Rice*, 573 S.W.3d 53, 71 (Mo. banc 2019) (internal quotation omitted).

Here, Haneline was charged with possession of a controlled substance for possessing methamphetamine in the plastic baggy found next to the illegally searched lunchbox. Haneline does not argue that the discovery of methamphetamine in the baggie was the product of an unreasonable, warrantless search. Rather, Haneline argues that the discovery of the drug paraphernalia located inside the lunchbox was obtained illegally and was extensively relied on by the State at trial to establish that he possessed the drugs in the baggie and that he was aware of their presence and illegal nature. Haneline was not charged

20

with possession of drug paraphernalia. However, the State introduced evidence of the contents of the lunchbox as drug paraphernalia to establish that Haneline knowingly possessed the methamphetamine. Garza testified extensively about the contents of the lunchbox connecting them with illegal drug use. He testified that he found a radio antenna inside the lunchbox, which, in his experience, is used by methamphetamine users "for poking and prodding at the crystals while, you know, the user is smoking it. They'll push the crystals around with the metal rod and it will make them burn easier." Garza also found several disposable razor blades, which he testified are used "as a type of improvised grinder, per se. With meth, [users] will take the crystals and they'll use the razor to kind of grind it off and make it finer so it can be smoked.". Further, Garza found two batteries, which he testified "can be used for cutting the substance and amplifying the high or cutting the substance to make it more." Garza also found Haneline's Missouri driver license in the black lunchbox. In overruling Haneline's objection to Garza's testimony concerning the contents of the lunchbox, the trial court stated, "If it shows that he has drug paraphernalia right near the drugs, themselves, and that lunchbox has a strong connection to the defendant, which I understand from the State's argument at the motion in limine that it does, then it would be evidence that the jury could consider as evidence that he knowingly possessed the controlled substance."

The admission of the contents of the lunchbox and Garza's testimony regarding them as drug paraphernalia was relevant to Haneline's mental state in relation to his knowing possession of methamphetamine, which is an element of the offense. *See State v. Purlee*, 839 S.W.2d 584, 588 (Mo. banc 1992). Although Garza testified that he discovered

methamphetamine partially buried in the ground near where Haneline had been, most of the testimony at trial surrounded Garza's discovery of the items in the lunchbox. The State relied heavily on this evidence in establishing that the methamphetamine belonged to Haneline and that he knowingly possessed the controlled substance. The drug paraphernalia located within the lunchbox found with Haneline's driver's license were the most significant evidence that the drugs buried in the ground belonged to Haneline and that he knew of the presence and nature of the drugs. Therefore, the trial court's error in admitting the contents of the lunchbox was not harmless beyond a reasonable doubt. We reverse the judgment of conviction and sentence of the trial court. Because Haneline's second point on appeal pertains to Garza's testimony regarding the contents of the lunchbox, it is rendered moot, and we do not address whether the trial court erred in admitting the testimony based on relevancy.

Point III is granted.

### *Point I: Sufficiency of the evidence*

Although we reverse the conviction based on the erroneous admission of evidence, we separately address Haneline's sufficiency-of-the-evidence argument, because "a finding of insufficient evidence would require entry of a judgment of acquittal, and would bar [Haneline's] retrial." *State v. Matthews*, 552 S.W.3d 674, 681 n.6 (Mo. App. W.D. 2018). Haneline argues that the trial court erred in overruling his motion for judgment of acquittal because the State failed to prove beyond a reasonable doubt that Haneline had knowledge of and control over the controlled substance he was charged with possessing. In evaluating the sufficiency of the evidence, both admissible and inadmissible evidence presented at

22

trial should be considered, since ignoring inadmissible evidence might prejudice the State, in that the State may be deprived the opportunity to "present additional evidence that would have been presented at the first trial if it had not been cumulative to at least some of the improperly-admitted evidence." *State v. Feldt*, 512 S.W.3d 135, 155 (Mo. App. E.D. 2017).

"When reviewing the sufficiency of the evidence to support a conviction and a trial court's denial of a motion for judgment of acquittal, our task is to determine whether sufficient evidence was presented at trial to permit a reasonable fact finder to find the defendant's guilt beyond a reasonable doubt." *State v. Glaze*, 611 S.W.3d 789, 794 (Mo. App. W.D. 2020). In doing so, we accept as true "all the evidence favorable to the verdict, including all favorable inferences properly drawn from the evidence," and we disregard all evidence and inferences to the contrary. *State v. Berwaldt*, 652 S.W.3d 793, 796 (Mo. App. W.D. 2022). "This is not an assessment of whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *State v. Zetina-Torres*, 482 S.W.3d 801, 806 (Mo. banc 2016)).

"A person commits the offense of possession of a controlled substance if he or she knowingly possesses a controlled substance[.]" Section 579.015.1. Possession or "possessing a controlled substance" is statutorily defined:

> [A] person, with the knowledge of the presence and nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his or her person or within easy reach

23

and convenient control. A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it. Possession may also be sole or joint. If one person alone has possession of a substance possession is sole. If two or more persons share possession of a substance, possession is joint[.]

Section 195.010(38). To sustain a conviction for possession of a controlled substance, the State must prove conscious and intentional possession of the substance, either actual or constructive, and awareness of the presence and nature of the substance. *Purlee*, 839 S.W.2d at 588. "Possession and knowledge may be proved by circumstantial evidence." *Zetina-Torres*, 482 S.W.3d at 807.

Here, sufficient evidence supported Haneline's conviction because he had actual possession of methamphetamine and awareness of the nature of the substance. Garza observed Haneline digging in the dirt on the embankment, and when Garza went to the exact spot where Haneline had been digging, Garza observed the black lunchbox, a pellet rifle, and a plastic baggy that contained methamphetamine partially buried in the dirt. Garza testified that just the stem of the plastic baggy was sticking out of the ground, and the dirt around the baggy had been disturbed. Based on these facts a reasonable juror could infer that Haneline was attempting to bury the baggy of methamphetamine in the ground, which would have required Haneline's actual possession of the methamphetamine while attempting to bury it. Although Garza did not find methamphetamine on Haneline's person at the time of the arrest, "the law does not require that actual possession occur during the search." *State v. Thurmond*, 616 S.W.3d 316, 325 (Mo. App. E.D. 2020). Rather, as in *Thurmond*, the "jury could have drawn a reasonable inference that [Haneline] was

sufficiently close to the methamphetamine . . . to possess it at some point prior to the search[.]" *Id.*

The evidence also supports that Haneline was aware of the nature of the controlled substance. Actual possession alone may provide a reasonable inference of such knowledge, in that a "jury may infer that a person knows the nature of drugs in his actual possession." *State v. Goff*, 439 S.W.3d 785, 793 (Mo. App. S.D. 2014). Further, Haneline's attempt to conceal the methamphetamine by burying it in the ground as a patrol car entered the conservation area is consistent with knowledge that possession of its contents violated the law. *See State v. Camerer*, 29 S.W.3d 422, 426 (Mo. App. S.D. 2000). Additional incriminating evidence, such as the contents of the black lunchbox found next to the methamphetamine, which Garza testified are used to assist users in smoking the methamphetamine, and Haneline's denial of his ownership of the lunchbox that contained his driver's license, when viewed in the light most favorable to the State, satisfy the second element that Haneline had knowledge of the presence and nature of the controlled substance.

Haneline argues that he did not have actual possession of methamphetamine because the plastic baggy was found 20 to 40 yards away from him. Haneline argues that Garza did not discover the methamphetamine until Haneline was talking to the other deputies in the parking lot a distance away from where the drugs were discovered. Therefore, according to Haneline, it was not on his person or within easy reach or convenient control at the time Garza located the controlled substance. However, several Missouri cases with similar facts have held that a defendant had actual possession of a controlled substance

25

even when the substance was later found distant from the defendant. For example, in *State v. Welch*, 603 S.W.3d 745, 747 (Mo. App. S.D. 2020), police responded to a call of a suspicious person in a portable bathroom on a construction site in the middle of the night. When police knocked on the door of the bathroom, a man reluctantly exited and told the officer that he was just out for a walk and that he was staying at a nearby residence. *Id.* The officer allowed the man to leave but then searched the toilet of the portable bathroom. *Id.* There, floating on the water inside the toilet, the officer found a black velvet bag that contained a dry lightbulb with the filament removed that contained methamphetamine. *Id.* The Southern District of this Court held that these facts "could give rise to a reasonable inference that Defendant attempted to conceal or dispose of the illicit materials in the toilet *after* his presence in the portable bathroom was discovered by [the officer], but *before* Defendant exited the bathroom." *Id.* at 749. The Court further held, "In completing his attempted concealment or disposal of the illicit materials, Defendant necessarily would have had those materials within his easy reach and convenient control, *i.e.*, in his actual possession." *Id.*

Similarly, in *State v. McLane*, 136 S.W.3d 170 (Mo. App. S.D. 2004), the defendant was sitting in the passenger seat of a vehicle during a traffic stop. The officer noticed the passenger window open and then close, so he walked around the vehicle to the passenger side. *Id.* at 172. There, he found a green change purse on the ground, which contained methamphetamine. *Id.* Although the officer never observed the defendant with methamphetamine in his possession, the Court held that, "In order to have thrown the change purse from the pickup, defendant would have had to handle it and maintain control

26

over it[,]" which satisfies the requirements for actual possession. *Id.* at 173. Here too, although Garza never observed Haneline with methamphetamine in his possession, he observed Haneline digging in the ground and frantically getting up after Haneline saw the high beam lights from Garza's patrol car. Garza later searched the area where he had seen Haneline digging and found the methamphetamine. Similar to *Welch* and *McLane*, in order for Haneline to attempt to bury the plastic baggy of methamphetamine, he would have had to handle it and maintain control over the drugs. Accordingly, sufficient evidence supports the conviction of possession of a controlled substance because Haneline had actual possession of the methamphetamine, and his attempt to conceal the methamphetamine by burying it reveals his awareness of the substance.

Point I is denied, and therefore Haneline is not entitled to a judgment of acquittal.

## Conclusion

For the foregoing reasons, the judgment of conviction and sentence of the trial court is reversed, and the cause is remanded for a new trial.

_____
Gary D. Witt, Judge

All concur.

27